**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | |
| | : | **24-CR-351 (ACR)** |
| **OMOLERE OMOMOWO,** | : | |
| **Defendant.** | : | |
| | : | |

**GOVERNMENT'S MOTION FOR REVOCATION HEARING**
**TO REVOKE DEFENDANT'S CONDITIONS OF PRETRIAL RELEASE**

For a year and a half, Defendant Omolere Omomowo has secretly but methodically flouted this Court's authority by ignoring his conditions of release.  Despite explicit, repeated instructions that he was prohibited from engaging in any form of healthcare-related employment, the Defendant maintained ownership of his company, the Marcaulay Group, and continued to perform work related to the submission of bills to Medicaid.  Although he took thinly veiled steps to pretend to comply with his conditions of release—namely, switching bank accounts that received Medicaid funds and changing the Registered Agent listed on the Marcaulay Group's corporate documents— his company continued to bill Medicaid without skipping a beat.  Even more brazenly, the Defendant worked behind the scenes to facilitate the Medicaid bills submitted by his company. And the Medicaid funds continued to flow directly into the Defendant's pockets.  Just last year, $1.7 million in Medicaid funds paid off a $3.5 million condo in the Defendant and his wife's names.  Enough is enough.  Because the Defendant has effectively thumbed his nose at the Court, the United States respectfully requests that the Court hold a hearing pursuant to 18 U.S.C. § 3148, revoke the Defendant's conditions of release, and detain him pending trial.

**BACKGROUND**

**A.      Defendant's Conditions of Release Prohibit Healthcare Employment**

1

On August 1, 2024, the grand jury returned a fifteen-count indictment charging the Defendant with one count of conspiracy to commit health-care fraud, 18 U.S.C. § 1349, ten counts of health-care fraud, 18 U.S.C. § 1347, and four counts of expenditure money-laundering, 18 U.S.C. § 1957.  At the conclusion of a three-day detention hearing in the Southern District of Florida, Magistrate Judge Panayotta Augustin-Birch ordered the Defendant to be placed on GPS monitoring and ordered the Defendant be released on certain conditions, including a $100,000 personal surety bond.  During the hearing, the Defendant offered Isaiah Sistrunk as a co-signer of the bond.  *See* Ex. A at 3.  Mr. Sistrunk informed the Court he was a "good friend" of the Defendant through their church.  *Id*.

Most important here, as one of the conditions on which the Court released the Defendant, the Court ordered the Defendant "not to have any employment in the healthcare field" or "any employment in relation to billing or insurance."  *See* Ex. A at 11.  The Defendant stated that he understood the employment restriction and signed the Order setting his conditions of release, which also specifically listed "no healthcare, billing, and insurance."  *See* Ex. B at 3.  When the Defendant was appeared in D.C. on the charges on August 21, 2024, Judge Upadhyaya reiterated the same employment restriction, which the Defendant acknowledged.  *See* Ex. C at 4.

**B.      Defendant Distances Himself from the Marcaulay Group—on Paper, At Least**

In response to the employment restriction, the Defendant took thinly veiled steps to appear as if he had relinquished control of the Marcaulay Group, the legal entity incorporated by the Defendant in Florida in 2021 to facilitate the scheme to defraud Medicaid.  *See* ECF No. 1 at ¶ 28-29.  On August 27, 2024, six days after he appeared in D.C., for example, an Amended Annual Report for the Marcaulay Group was filed with the Florida Secretary of State (the "August 27 Amendment").  *See* Ex. D, E.  Until the August 27 Amendment, Defendant Omomowo had been

listed as the sole owner or President of the Marcaulay Group on all public filings, including when the Defendant filed papers with the Maryland Secretary of State on June 21, 2022 to incorporate the Marcaulay Group in Maryland. *See* Ex. F.

After the Defendant filed corporate paperwork for the Marcaulay Group in Maryland, he also filed a Trade Name Application with the Maryland Secretary of State on August 3, 2022, for a purported company called NextEra Health. *See* Ex. G. The Trade Name application, however, indicated that NextEra was wholly owned by the Marcaulay Group. *Id*. In May 2023, the Defendant applied for a Medicaid Provider agreement with Maryland Medicaid on behalf of Marcaulay Group doing business as NextEra. *See* Ex. H. Like the other corporate documents related to the Marcaulay Group, the Maryland Medicaid Provider Agreement indicated that the Defendant was the sole owner. *Id*. at 12. The Marcaulay Group Maryland Provider Agreement grants authorization for the Marcaulay Group to provide Medicaid services to Maryland residents. *Id*. Similarly, the Marcaulay Group is the entity registered with Maryland Medicaid as the Provider (and the entity that receives Medicaid funds). *See* Ex. I. Importantly, under the Maryland Medicaid regulations, if a Medicaid Provider changes ownership, the Provider is required to submit a change in ownership with Maryland Medicaid to reflect the change so that Maryland Medicaid has full disclosure of the responsible party for any bills submitted by a Provider. *See* Ex. J. This never happened—the Defendant is still listed as the owner of the Marcaulay Group in Maryland Medicaid records. From August 27, 2024 to October 2025, financial records indicate that Maryland Medicaid paid more than $13.2 million to the Marcaulay Group. [1]

---

[1] Subsequent communications from Maryland Medicaid reflect that payments from Maryland Medicaid have continued to the Marcaulay Group to the present. In total, between August 1, 2024 and April 30, 2026, Maryland Medicaid has paid the Marcaulay Group approximately $18.5 million. *See* Ex. O.

The August 27 Amendment filed with the Florida Secretary of State purported to change the Registered Agent of the Marcaulay Group from the Defendant to an individual named Jonathan Jones.  *See* Ex. D at 1.  Around the same time as the August 27 Amendment, the bank account receiving Maryland Medicaid funds was switched from a JP Morgan Chase bank account in the name of the Marcaulay Group to a Wells Fargo account (the "Wells Fargo account") opened on August 29, 2024 in the name of "Cellular Health Foundation."[2]  *See* Ex. K.  The sole owner of the Wells Fargo account was Jonathan Jones.[3]  *Id*.  On the signature card for the Wells Fargo account, however, Cellular Health is listed as "DBA THE MARCAULAY GROUP INC."  Similarly, the email address marcaulay@cellularhealth.org is listed as one of the associated email addresses.

Notwithstanding that the Defendant changed the Registered Agent of the Marcaulay Group in Florida to Jonathan Jones, the Defendant did not relinquish ownership of his company to Jones (or anyone else, for that matter).  Jonathan Jones does not even have a user account for NextEra's Credible account, the Electronic Medical Records ("EMR") platform used by NextEra to submit claims to Maryland Medicaid.  The Defendant, however, not only has a NextEra Credible account, he has continued to access and conduct a variety of tasks regarding bills submitted to Medicaid within NextEra's EMR domain.  *See* Ex. L, M, N.  And he has done so for the past year and a half—from August 2024 through April 2026.  In other words, the Defendant has continued to be engaged in NextEra's operations and bills submitted to Maryland Medicaid.

---

[2] As of July 2024, the JP Morgan Chase account in the Marcaulay Group's name was receiving funds from Maryland Medicaid. Although there is a one-month gap in the financial records obtained as part of the investigation, and the government did not obtain records from Maryland Medicaid prior to the August 1, 2024 indictment date, financial records show Maryland Medicaid funds being deposited into the JP Morgan Chase account that are consistent with the deposits that went into the Wells Fargo account.

[3] Shortly after the Wells Fargo account was created, Simone Sistrunk was added as a signatory and authorized user of the account.  As noted below, Simone Sistrunk is the wife of Isaiah Sistrunk, the Defendant's "good friend" from his church.

Nor did Jonathan Jones receive the Lion's Share of Maryland Medicaid funds. Far from it. Of the approximately $13.2 million in Maryland Medicaid funds paid to the Marcaulay Group between August 1, 2024 and September 2025, approximately $9.3 million was used for payroll expenses. Of the remaining $3.8 million, more than half—$1.9 million to be more specific—was transferred from the Wells Fargo account into a separate Bank of America account also belonging to Cellular Health Foundation (the "BOA account"). After the Medicaid funds were transferred to the BOA account, financial tracing shows a series of complicated financial transactions in which money moved from the BOA account to various other accounts, principally an account owned by Simone Sistrunk, Isaiah Sistrunk's wife. The end result of these transactions was that approximately $1.7 million in Maryland Medicaid funds went toward the purchase of a $3.5 million condo that Defendant Omomowo and his wife closed on in July 2025.[4] *See* Ex. O. The remaining funds were distributed in smaller amounts to various individuals or payments associated with the Defendant. A summary of the distribution of funds is set forth in the below table:

| Counterparties | Approx. Amount |
|---|---|
| Payroll Expenses | $ (9,356,035) |
| Cellular Health Foundation Inc | $ (1,923,954) |
| BizFund LLC | $ (658,765) |
| Marcaulay Group Ltd | $ (174,163) |
| Withdrawal | $ (110,000) |
| Jonathan E Jones | $ (99,379) |
| Gerard Smill Mendoza Fleming | $ (75,000) |
| Taxes & Other fees | $ (60,195) |
| Flagler Village | $ (49,984) |
| Qualifacts | $ (49,978) |
| Victor Arowobegbe | $ (44,960) |
| (Various Counterparties) | $ (40,743) |

---

[4] The condo is listed in the indictment as part of the forfeiture allegations. In September 2024, $383,000 was seized from the escrow account pursuant to a seizure warrant obtained in the District of Columbia. With respect to the funds seized from the escrow account, $350,000 in Maryland Medicaid funds were paid to Defendant's wife in November 22, 2024. On November 26, 2024, $383,000 was deposited back into the escrow account via check written by the Defendant's wife. *See* Ex. P. In other words, once the FBI seized the funds in the escrow account (that had paid with D.C. Medicaid funds), those funds appear to have been replaced with Maryland Medicaid funds.

| | | |
|---|---|---|
| Zelle Transfers | $ | (36,218) |
| Quantum Apartments | $ | (34,062) |
| Chiko Perfect Office | $ | (34,036) |
| Jeisson Rafael Rosado Ramirez | $ | (7,250) |
| Omomowo Dell | $ | (2,000) |
| Florida Power & Light | $ | (1,327) |
| **TOTAL** | **$** | **(12,758,050)** |

Several of the expenses and counterparties listed in the above table reflect payments made for or on behalf of the Defendant. The Marcaulay Group Ltd., for example, is the Defendant's brother's company registered in the United Kingdom. The payments to Flagler Village, payments to in-laws of Omomowo—specifically, the payments to Victor Arowobegbe and Jeisson Ramirez—and the payments to Florida Power and Light were made for or on behalf of the Defendant or to the Defendant's relatives.

**ARGUMENT**

The crux of this case is that the Defendant used his employees as pawns to steal millions from D.C. Medicaid, created a shell company to keep his conduct under the radar, and laundered the proceeds through various bank accounts to furnish a lavish lifestyle. The Defendant's second verse is the same as the first. Rather than abide by the minimal condition of release requiring him to cease any employment with Medicaid billing, the Defendant chose to flout the authority of this Court. Not only has the Defendant continued to actively engage in NextEra's operations, he has also continued to profit handsomely from Medicaid funds. Because of his lack of respect for the Court's authority, the Defendant cannot be trusted to comply with his conditions of release and should be detained pending trial.

A.    **Applicable Legal Principles**

A defendant "who has violated a condition of release, is subject to a revocation of release, an order of detention, and a prosecution for contempt of court."  18 U.S.C. § 3148(a).  For purposes of a bail revocation hearing, the Government may proceed by way of proffer.  *See United States v. Smith*, 79 F.3d 1208, 1209-10 (D.C. Cir. 1996); *see also United States v. LaFontaine*, 210 F.3d 125, 131 (2d Cir. 2000) ("proffers are permissible both in the bail determination and bail revocation contexts."). Under § 3148(b), the Court shall revoke a defendant's release and order detention if, after a hearing, the Court -

> (1) finds that there is -
>
>> (A) probable cause to believe that the person has committed a Federal, State, or local crime while on release; or
>>
>> (B) clear and convincing evidence that the person has violated any other condition of release; and
>
> (2) finds that –
>
>> (A) based on the factors set forth in section 3142(g) of this title, there is no condition or combination of conditions of release that will assure that the person will not flee or pose a danger to the safety of any other person or the community; or
>>
>> (B) the person is unlikely to abide by any condition or combination of conditions of release.

18 U.S.C. § 3148(b).

### B.     The Evidence is Clear and Convincing that Defendant Has Continued to Engage in Medicaid Billing in Defiance of this Court's Conditions of Release.

Notwithstanding explicit orders from two federal judges that he could no longer have "any involvement" with Medicaid or healthcare billing, the Defendant continued to do exactly that: facilitate claims submitted by his company to Maryland Medicaid.  And he never stopped.  He was ordered by Judge Upadhyaya to cease healthcare billing on August 21, 2024.  Nine days later, he logged in to NextEra's EMR platform and reprocessed client visits and updated client insurance information:

7





He has continued to access and take actions within NextEra's EMR database to facilitate

NextEra's Medicaid billing as recently as April 30, 2026:

8



The Defendant's violation of his conditions of release comes as no surprise, either. By all accounts, the Defendant cannot abide others exercising control over what he believes to be the fruits of his labor. The allegations set forth in the indictment and in discovery make clear that the Defendant is sophisticated and takes great care to insulate himself from the fraudulent conduct he oversees. Despite being required to register his company as a Provider or SubProvider with D.C. Medicaid, he kept the Marcaulay Group entirely in the shadows. D.C. Medicaid requires that any Medicaid Provider be registered to conduct business in the District. The Marcaulay Group, however, is nowhere to be found in the D.C. Secretary of State records. But for this case, D.C. Medicaid would never have known that the Marcaulay Group even existed.

Although he switched the Registered Agent of the Marcaulay Group, he has maintained complete ownership and control of the Marcaulay Group. In fact, in a recent debriefing with law enforcement, a cooperating witness and one of the Defendant's former co-conspirators informed law enforcement that he had conversations in 2024 in which the Defendant said he intended to "hire" a "figurehead" to take over ownership on paper of NextEra but that the Defendant would still be "the leader in the background." These statements from the cooperating witness are

corroborated by recurring payments to Jonathan Jones that are described as "1K per week."  The Defendant "hired" a "figurehead."  Similarly, several individuals still in contact with the Defendant told the same cooperating witness that, although the Defendant had installed a frontman to be in charge of NextEra, in reality, the Defendant was still "the boss," attending NextEra meetings in Maryland and recruiting individuals to work for him.

NextEra's EMR database corroborates the statements from the cooperating witness and confirms that the Defendant has brazenly continued to conduct business as usual at NextEra.  Just as he did before he was ordered to stop, the Defendant has consistently and repeatedly accessed and taken actions regarding Medicaid bills within NextEra's EMR database.  Nor can the Defendant claim that he believed changing the Registered Agent somehow affected his ownership of the Marcaulay Group.  When a different cooperating witnesses confronted the Defendant about listing her as a Registered Agent for the Marcaulay Group in 2024, the Defendant explained (in no uncertain terms) that "[a]nybody, any random person, can be a registered agent," which he helpfully explained has "nothing to do" with ownership of a company:



The Defendant's transparent attempts to hide his continued ownership and involvement with the Marcaulay Group by simply listing someone else as the Registered Agent is an insult to this Court's intelligence. The Defendant's use of multiple bank accounts to make it harder to follow the money is also par for the Defendant's course. The Wells Fargo account—the account into which all of the Marcaulay Group's Medicaid funds from Maryland was deposited—was created at the same time the Registered Agent was changed for the Marcaulay Group. And

although the series of transactions involving the Maryland Medicaid funds is indeed convoluted (and suspicious), the bottom line is not: the money eventually wound its way to the Defendant's pockets. Put simply, the Defendant used the same tricks at NextEra in Maryland that he believed would insulate him from his misdeeds in D.C. Eventually, however, the truth will out. Clear and convincing evidence proves the Defendant brazenly violated his conditions of release.

**C.     The Defendant Has Demonstrated He is Unlikely to Abide by Any Condition or Combination of Conditions of Release.**

The Defendant started violating his conditions of release as soon as he signed them. Unlike many defendants in white-collar cases, who often demonstrate perfect pretrial compliance, the Defendant has signaled a lack of respect for the Court, its authority, and the conditions on which he was released. And if it were not for diligent investigators, his violation would have remained under cover. Moreover, with trial less than a month away, the Defendant has even less incentive to comply with any additional conditions the Court may impose. Accordingly, the Defendant has forfeited his right to have the Court craft any combination of conditions to ensure his compliance. He should be detained pending trial.

**D.     The Government Should Also Be Permitted to Introduce this Evidence Pursuant to Rule 404(b) or 608.**

The government understands that the time by which the government was required to provide notice pursuant to Federal Rule of Evidence 404(b) has passed. The government only recently learned of the Defendant's breach, however. Because the Defendant's knowledge and intent is likely to be the central contested issue at trial, his violation of the conditions of his release and continued involvement with Medicaid billing is probative of his knowledge and intent as to whether he conspired to defraud Medicaid. *See* Fed. R. Evid. 404(b) (other bad acts admissible to show "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or

12

lack of accident"); *see also United States v. Machado-Erazo*, 901 F.3d 326, 333 (D.C. Cir. 2018) (Rule 404(b) "permits such evidence for other purposes, including proof of motive, intent, knowledge, identity and absence of mistake."). Because "Rule 404(b) is a rule of inclusion rather than exclusion," *United States v. Bowie*, 232 F.3d 923, 929 (D.C. Cir. 2000), the rule excludes only a narrow set of evidence—that which has no other purpose except to prove a defendant's character. *Bowie*, 232 F.3d at 930. The fact that the Defendant continued to submit bills to Medicaid *knowing* that he was precluded entirely from engaging in healthcare employment rebuts any suggestion that his scheme to defraud was an accident or mistake. The evidence fits comfortably within the permissible uses under Rule 404(b). The government thus seeks leave of the Court to introduce this evidence for this permissible purpose.

Even if the Court does not permit the government to introduce evidence of the Defendant's violation of his conditions of release in its case-in-chief, the Court should permit the government to inquire about the Defendant's conduct at NextEra during its cross-examination of the defendant and any character witnesses. Rule 608(b) provides as follows:

> [E]xtrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness. But the court may, on cross-examination, allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness of: (1) the witness; or (2) another witness whose character the witness being cross-examined has testified about.

In considering whether a topic is probative of untruthfulness, the district court may consider whether the instances of prior untruthfulness bore some similarity to the conduct at issue, whether or not they were remote in time, and whether there was some likelihood they happened. *United States v. Miller*, 738 F.3d 361, 376 (D.C. Cir. 2013) (citing *United States v. Simonelli,* 237 F.3d 19, 23 (1st Cir. 2001)). A witness's credibility may be attacked based on misconduct that, while

not constituting a criminal conviction, nevertheless tends to show that the witness is untruthful. *United States v. Whitmore*, 359 F.3d 609, 620 (D.C. Cir. 2004). If the Defendant testifies at trial or offers character witnesses, he will have placed his character for truthfulness squarely at issue. The government should therefore be permitted to inquire on cross-examination about payments from Maryland Medicaid and steps the Defendant took to disguise those payments—especially given the striking similarity Defendant's conduct at NextEra bears to his conduct at Prestige and Affordable. Likewise, given the money-laundering charges and the similarity of the payments from D.C. Medicaid that went toward the Defendant's purchase of his first $3 million condo, the government should be allowed to inquire as to whether payments made to purchase a second $3.5 million condo are probative of the Defendant's character for truthfulness.

## CONCLUSION

WHEREFORE, the government respectfully requests that the Court hold a revocation hearing and detain the Defendant pending trial in this matter.

Respectfully submitted,

JEANINE F. PIRRO
United States Attorney

By:    /s/ *Christopher R. Howland*
Christopher R. Howland (D.C. Bar No. 1016866)
Jason Facci (D.C. Bar No. 1027158)
Kevin Reddington (CA Bar No. 336904)
Assistant United States Attorneys
Fraud, Public Corruption, & Civil Rights
601 D Street, NW
Washington, DC 20530
Tel: 202.252.7106 (Howland)
Christopher.Howland@usdoj.gov

14